IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| CYNTHIA BECKER KULBACKI, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:15-297 Magistrate Judge Lisa Pupo Lenihan |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) ) | |
| Defendant. | ) | |

**OPINION**

**I. Introduction**

Plaintiff Cynthia Becker Kulbacki ("Kulbacki") brings this action pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is presently before this Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 10 & 17). The record has been developed at the administrative level.[1] For the reasons that follow, Kulbacki's motion for summary judgment (ECF No. 10) will be granted, the Commissioner's motion for summary judgment (ECF No. 17) will be denied, and the decision of the Administrative Law Judge ("ALJ") will be vacated and remanded for further consideration consistent with this opinion.

**II. Statement of the Case**

**A. Procedural History**

---

[1] All references to the administrative record, (ECF No. 6), will be cited in the following format: (R. at p. xx).

1

Kulbacki filed an application for SSI benefits on November 30, 2011, alleging that her disability began December 1, 2009. (R. at pp. 11, 116). Her application was initially denied on March 2, 2012. (R. at pp. 60-64). Kulbacki responded by filing a request for an administrative hearing, (R. at p. 65), which was scheduled for May 8, 2013. (R. at p. 73).

The hearing was held on its scheduled date before ALJ David J. Kozma. (R. at pp. 24-40). Kulbacki testified at the hearing, represented by counsel. (R. at pp. 26-36). Mary Beth Kopar, M.Ed., an impartial vocational expert, also provided testimony concerning the nature of jobs and expectations of employers existing in the national economy. (R. at pp. 37-39). In a decision dated May 22, 2013, the ALJ determined that Kulbacki was not "disabled" within the meaning of the Act. (R. at p. 19). Following her receipt of the ALJ's decision, Kulbacki filed a request for its review with the Appeals Council on June 19, 2013. (R. at pp. 6-7). This request was denied on January 2, 2015, making the ALJ's decision the final decision of the Commissioner. (R. at pp. 1-3). Kulbacki commenced this action on March 3, 2015, seeking judicial review of the Commissioner's decision. (ECF No. 2). Kulbacki and the Commissioner filed cross-motions for summary judgment on August 3, 2015 and October 23, 2015, respectively, (ECF Nos. 10 & 17), each also filing a brief in support thereof, (ECF Nos. 11 & 18). These pending motions for summary judgment are now ripe for disposition.[2]

**B.  General Background**

Kulbacki was born on May 19, 1960, making her forty-eight years of age on her alleged disability on-set date and fifty-two years of age at the time of the hearing. (R. at p. 26, 171). She

---

[2] The Court acknowledges that judicial review under the Act is not governed by the standards generally applicable under Federal Rule of Civil Procedure 56. Banks v. Shalala, 43 F.3d 11, 13-14 (1st Cir. 1994); Flores v. Heckler, 755 F.2d 401, 403 (5th Cir. 1985). In this context, the procedure typically employed at the summary-judgment stage of litigation "merely serves as a convenient method under which both parties may present appropriate briefs in support [of] and in opposition to the[ir] respective positions." Sumler v. Bowen, 656 F.Supp. 1322, 1330 (W.D. Ark. 1987).

graduated from high school but received no further formal education. (R. at p. 26). She is currently single and has a teenage son. (R. at pp. 148-49). She rents a small home where she lives with her son. (Id.).

Kulbacki has worked part-time for short stints as a daycare attendant and as a cashier, but has not worked since she had several surgeries. (R. at pp. 26-27). Her alleged impairments include abdominal problems, acid reflux, chronic pneumonia, fibromyalgia, migraine headaches, degenerative disc disease, and depression/anxiety. (R. at pp. 13, 134). This appeal relates only to the assessment of Kulbacki's migraine headaches, so the Court will only recount the medical evidence as it relates to that condition.

### C. Medical History

While much of the record consists of medical records pertaining to Kulbacki's other medical issues, the Court was able to find the following documentation regarding migraine headaches. On January 19, 2010, neurologist Eileen M. Rice, M.D. ("Rice") sent a letter[3] to one of Kulbacki's physicians at Deer Lakes Medical who appears to have referred Kulbacki to Rice. (R. at p. 812). The letter states that Kulbacki "has chronic headaches" among other issues and indicates that Rice intends to adjust her medication and run several tests. (Id.). Rice also noted that Kulbacki's biggest complaint was reoccurring sinus and throat infections for which she was seeing another physician. (Id.).

A sleep study conducted in 2010 noted morning headaches. (R. at p. 270). That same year, Kulbacki complained of headaches to her primary care physician at Deer Lakes Medical, Michael E. Chismer, M.D. ("Chismer"), and asked to be taken off Ativan because she thought it might be causing them. (R. at p. 406).

---

[3] The Court notes that most of the treatment records from Rice appear to be missing from the record.

In October 2011, Kulbacki saw Chismer because of the headaches and was prescribed Imitrex. (R. at p. 299). Kulbacki called Deer Lakes Medical later the same month complaining of "severe migraines" and requested a prescription. (R. at p. 531). An email exchange between a physician, a nurse, and a physician's assistant at Deer Lakes Medical indicates that "[t]he imitrex is working" but that Kulbacki's insurance will only pay for nine pills a month. (R. at p. 530). Stephanie May, PA-C ("May") informed the nurse that Kulbacki should schedule with Rice to get on a daily suppression medicine for her headaches. (Id.).

On November 10, 2011, Rice sent a letter to another one of Kulbacki's physicians at Deer Lakes Medical. (R. at p. 234). Rice wrote that Kulbacki "has tension-migraine headaches which may be perimenopausal. Her headaches in the past seem to be mostly tension and now there is a significant migraine component with nausea and photophobia." (Id.). Rice wrote that she was going to prescribe 25 mg of Topamax for the headaches and increase to 50 mg after three weeks if necessary. (Id.).

On November 29, 2011, Kulbacki saw Tracy Wimbush, M.D. ("Wimbush") for a new patient consultation. (R. at pp. 538-39). Kulbacki described her chief complaint as "[t]he entire left side of my body hurts, right sided rib pain and migraines." (R. at p. 538). Kulbacki rated her pain 10/10 and reported a "diffuse headache that is constant." (Id.). Wimbush noted that Kulbacki had a history of migraines and that her family history included migraines. (Id.). Wimbush diagnosed fibromyalgia, chronic pain syndrome, history of opioid addiction, chronic daily headaches, and depression. (R. at p. 539). The next day, Kulbacki saw May and reported that she was not happy with Wimbush's advice and that she felt Wimbush "didn't really address" her migraines because she had a follow-up scheduled with her neurologist. (R. at p. 287).

4

Kulbacki saw Stephanie L. Archer, M.D. ("Archer") on April 9, 2012 because of her migraines and once again was diagnosed with same. (R. at p. 1250). In the "Reason for Visit" section there is a notation "same migraine x 1 week." (Id.). Archer assessed migraine headaches and refilled Kulbacki's prescription for Imitrex (100 mg daily). (Id.). She noted Kulbacki should follow up as previously scheduled or sooner if the headaches did not improve. (Id.).

On February 29, 2012, Kulbacki visited the emergency room complaining of migraines and back pain. (R. at p. 864). She was diagnosed with headaches. (R. at p. 867).

C. Golla, M.D. ("Golla") performed a disability evaluation in February 2012. (R. at pp. 818-21). Golla listed migraine headaches for the past two years as one of the chief complaints. (R. at p. 818). Kulbacki reported that the Imitrex "helps" but that she still gets frontal headaches almost every day which include nausea, and "they" would not give her more than nine pills. (Id.). The results of the physical examination were largely normal. (R. at p. 820). Golla's report does not offer an opinion as to whether Kulbacki can work and concluded with the clinical impression that she had migraine headaches among other conditions. (Id.).

Also in February 2012, Stanley H. Nadulek, Ph.D., P.C. ("Nadulek") performed a clinical psychological disability evaluation. (R. at pp. 827-34). Nadulek's report primarily discusses Kulbacki's psychological status, however he noted that she complained of migraine headaches and includes migraines as one of the AXIS III diagnoses. (R. at pp. 828-29, 833). Nadulek concluded that Kulbacki "would be able to perform some type of gainful employment on at least a part-time basis"; although that conclusion appears to be based mostly on an evaluation of her psychological conditions. (R. at p. 834).

**D.     The Administrative Hearing**

At the hearing before the ALJ on May 8, 2013, Kulbacki testified about her numerous medical conditions, describing many of them as severe and disabling. (R. at pp. 24-40). She indicated that she walks with a cane and uses oxygen because of various conditions. (R. at pp. 29-30). With regard to her migraines, Kulbacki testified that she gets headaches three to four times a week, the worst of which can last for several days. (R. at p. 31). She testified that the headaches render her unable to function, cause her to feel nauseated, and require her to lie down in complete silence. (R. at pp. 31-32). The ALJ did not follow up with any questions regarding migraines. See generally (R. at pp. 24-40).

When asked to assume the residual functional capacity ("RFC") that Kulbacki's attorney elicited from her during questioning, the vocational expert indicated Kulbacki could not perform any type of work. (R. at p. 37) ("Based upon the reported need to lie down from headaches and the pain, and the need to rest on and off ongoing throughout the day would preclude work."). The ALJ then asked the vocational expert to assume "unskilled low stress type of work" with "simple repetitive tasks" with a "sit/stand option." (R. at p. 38). The vocational expert indicated that Kulbacki could do the work of a marker, order caller, and assembler. (Id.).

### E. The ALJ's Opinion

After consideration of the above, as well as testimony by the vocational expert, the ALJ determined that Kulbacki was not "disabled" within the meaning of the Act. (R. at p. 19). The ALJ determined that Kulbacki had the following severe impairments: degenerative disc disease (status post multiple surgical procedures), fibromyalgia, migraines, depressive disorder, and anxiety disorder. (R. at p. 13). The ALJ evaluated a number of these impairments at step three before concluding that Kulbacki did not meet any of the listings. (R. at pp. 13-14). The ALJ did

not discuss the migraines at step three. (Id.). Based on these impairments, the ALJ determined that Kulbacki has the residual functional capacity to:

> perform light work as defined in 20 CFR 416.967(b) except that she requires the opportunity to alternate sitting and standing at will to relieve symptoms. She is limited to simple, routine, repetitive tasks done in a low-stress environment that does not require the exercise of independent judgment or entail intensive supervision.

(R. at p. 14). The ALJ determined that Kulbacki did not have any past relevant work. (R. at p. 18). However, based on testimony by Kopar, the ALJ determined Kulbacki could perform jobs existing in significant numbers in the national economy, including marker, order caller, and assembler. (R. at p. 18).

In formulating the RFC, the ALJ found Kulbacki's testimony as to the intensity, persistence, and limiting effects of her symptoms to be not entirely credible given the following. Kulbacki's history of drug abuse and lack of work history suggested to the ALJ that her remaining out of the workforce was unrelated to her medical impairments. (R. at p. 16). "She has reduced her activities of daily living, but the record does not show that her reduced activity level is the direct and necessary result of her medically determinable impairments." (Id.). Despite her inability to use certain potent pain pills because of her addiction problems, Kulbacki "has not required and received significant alternative means of therapy such as physical therapy, chiropractic treatment, biofeedback, or other avenues of treatment. (Id.). Specifically with regard to Kulbacki's migraines, the ALJ noted only that despite her testimony that the headaches render her incapacitated several days a week, "there is no indication of frequent emergency room treatment for such episodes." (R. at p. 13).

### III. Standard of Review

This Court's review is plenary with respect to all questions of law. Schaudeck v. Commissioner of Social Security Administration, 181 F.3d 429, 431 (3d Cir. 1999). With

respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health & Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his ultimate findings, an ALJ must do more than simply state factual conclusions. He must make specific findings of fact. Stewart v. Secretary of Health, Education & Welfare, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. McCrea v. Commissioner of Social Security, 370 F.3d 357, 360-61 (3d Cir. 2004).

9

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196 (1947) (if the "grounds [relied on by the agency] are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."). The Third Circuit Court of Appeals has recognized the applicability of this rule in the Social Security disability context. Fargnoli v. Massanari, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. Cefalu v. Barnhart, 387 F.Supp.2d 486, 491 (W.D. Pa. 2005).

## IV.     Discussion

Kulbacki's motion for summary judgment raises two arguments regarding the sufficiency of the ALJ's consideration of her migraines. First, she argues the ALJ erred when he failed to make a finding as to whether her migraines met a listed impairment at step three of the sequential evaluation process. (ECF No. 11 at p. 3). Second, Kulbacki contends that the ALJ erred when he failed to account for any limitations in the RFC finding for her migraines, despite his determination that her headaches constituted a severe impairment at step two. (Id.). Because the ALJ largely failed to consider the migraines at all, the Court finds both of these arguments compelling.

### A.     The ALJ failed to consider whether Kulbacki's migraine headaches met one of the listings at step three

Kulbacki argues that the ALJ failed to consider the relevant listing for migraine headaches at step three. (ECF No. 11 at pp. 6-9). Current Social Security Agency policy states that while there is no listing specifically for migraines, the condition should be analyzed using the most analogous listing, listing 11.03, which addresses "non-convulsive epilepsy." See Social

10

Security Administration National Q&A 09-036 (ECF No. 12); 20 C.F.R. § 404, Subpt. P., App. 1, 11.03. The Commissioner does not appear to dispute that 11.03 is the appropriate listing for migraine headaches. See generally (ECF No. 18).

The Third Circuit Court of Appeals has held that an ALJ must provide an explanation of his reasoning at step three in order to allow courts to engage in meaningful judicial review. Burnett v. Commissioner of Social Security, 220 F.3d 112, 119-20 (3d Cir. 2000). However, an ALJ need not "use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). Accordingly, an ALJ does not necessarily have to mention a particular listing, as long as he considered the evidence pertaining to the listed impairment and the evidence supported the ALJ's decision that the claimant did not satisfy the criteria. Scuderi v. Commissioner of Social Security, 302 F. App'x 88, 90 (3d Cir. 2008) ("an ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements."); see also Jones, 364 F.3d at 505 (affirming where "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing"); Klangwald v. Commissioner of Social Security, 269 F. App'x 202, 204 (3d Cir. 2008) ("the ALJ followed this conclusion with a searching review of the medical evidence. Under our precedents, this is sufficient.").

While the ALJ in this case considered a number of other listings at step three, there is no mention of listing 11.03 or Kulbacki's migraines. (R. at pp. 13-14). As discussed in more detail in the next section, the ALJ failed to discuss the medical evidence pertaining to Kulbacki's migraines anywhere in the opinion. The ALJ's opinion does not illustrate "that the ALJ

11

considered the appropriate factors in reaching the conclusion" nor is there a "searching review of the medical evidence" as it relates to migraines. This is insufficient under Third Circuit precedent. See e.g., Jones, 364 F.3d at 505; Klangwald, 269 F. App'x at 204. Without adequate discussion of the relevant medical evidence, the Court cannot meaningfully review the ALJ's step three analysis and must remand.

> **B.** **The ALJ failed to account for any limitation in the RFC or explain why he discounted the medical evidence and Kulbacki's testimony regarding her migraine headaches**

Kulbacki's second argument is that the ALJ failed to incorporate limitations into the RFC relating to her migraines. (ECF No. 11 at pp. 3, 9-11). The Commissioner argues that the medical evidence does not support Kulbacki's claim of migraines. (ECF No. 18 at pp. 9-13).

As noted above, an ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. Weir, 734 F.2d at 961. Courts generally afford significant deference to an ALJ's credibility determination. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). However, "[a]n ALJ must be particularly diligent in making credibility determinations with regard to migraines, because laboratory tests cannot prove their existence." Thomas v. Colvin, 2015 WL 4067147, at *5 (W.D. Pa. July 2, 2015) (quoting Parsley v. Astrue, 2009 WL 1940365, at *3 (W.D. Pa. July 2, 2009)). For this reason, courts have consistently held that when presented with documented allegations of symptoms consistent with the claimed disorder, it is not appropriate for an ALJ to reject a claimant's testimony solely based on an absence of objective evidence. Id. at *5; Abbruzzese v. Astrue, 2010 WL 5140615, at *7 (W.D. Pa. Dec. 9, 2010). Courts look at a number of factors in determining whether a claimant's complaints of migraines are credible, including: whether the claimant has been diagnosed with migraines; whether the claimant has received treatment and medication; the length of the history of complaints and treatment relating to migraines; the

alleged severity and frequency; the symptoms the claimant alleges the migraines cause; and whether the record contains any statements from doctors questioning the alleged frequency or severity. Thomas, 2015 WL 4067147, at *5-7 (collecting decisions).

Here, while the documentation relating to Kulbacki's migraines pales in comparison to the extensive documentation relating to her other medical issues, in the Court's view, there is sufficient evidence in the record that the ALJ should have addressed it. Kulbacki testified that she gets headaches three to four times a week, the worst of which can last for several days. (R. at p. 31). She testified that the headaches render her unable to function, cause her to feel nauseated, and require her to lie down in complete silence. (R. at pp. 31-32). At least three treating physicians have diagnosed Kulbacki with migraines (Rice, Wimbush, and Archer). (R. at pp. 539, 812, 1250). Kulbacki was also diagnosed with headaches after visiting an emergency room complaining of migraines. (R. at p. 867). She sought treatment for migraines from Rice, a neurologist, dating back at least as far as January 2010. (R. at p. 812). She likewise sought treatment from Chismer, Wimbush, and Archer specifically for migraines. (R. at pp. 299, 539, 1250). She has been prescribed Imitrex for several years, and while there are two statements in the record that the Imitrex "helps" and "is working", (R. at pp. 530, 818), neither statement indicates her headaches are fully controlled. Rice described her headaches as causing nausea and photophobia. (R. at p. 234). Kulbacki reported to Wimbush that the headaches were nearly constant and rated her pain 10/10. (R. at p. 538). The Court cannot find a single statement from any medical professional questioning the existence, severity, or frequency of her migraines. Even the state evaluating doctors, Golla and Nadulek, expressed no opinion contradicting Kulbacki's claim, and both list migraines among their diagnoses. See generally (R. at pp. 818-

13

21, 827-34). In short, most if not all of the factors courts look at are present in this case. See Thomas, 2015 WL 4067147, at *5-7 (collecting decisions).

As already noted, the ALJ found at step two that Kulbacki's migraines constituted a severe impairment. (R. at p. 13). After making this determination, the rest of the ALJ's opinion contains only one sentence referencing her migraines. See generally (R. at pp. 13-19). The ALJ writes only that "[Kulbacki] testified that her energy level is low and that she has recurrent migraines that render her non-functional several days a week, but again, there is no indication of frequent emergency room treatment for such episodes." (R. at p. 15). The ALJ provided no basis for the doubtful assertion that severe migraines typically result in emergency room visits and Kulbacki did in fact visit the emergency room at least once for migraines. (R. at p. 864). Furthermore, the ALJ did not mention, much less give reasons for discounting, any of the medical evidence relating to migraines, leaving the Court with no reason to conclude the ALJ considered it at all.

Despite finding that Kulbacki's migraines constituted a severe impairment and not explaining why he discounted the relevant medical evidence and testimony, the ALJ failed to include any limitations for migraines in formulating the RFC. "An explanation should be provided when, as here, an impairment found to be severe at step two is determined to be insignificant in later stages of the sequential evaluation." Thomas, 2015 WL 4067147, at *8 (quoting Spears v. Colvin, 2013 WL 5350916, at *4 (E.D. Okla. Sept. 25, 2013)). The ALJ provided no such explanation.[4] The error is particularly troubling here, where the vocational

---

[4] It is true that the ALJ made a negative credibility determination that Kulbacki was exaggerating the seriousness of her symptoms generally. (R. at p. 16). And credibility determinations are generally entitled to great weight. Reefer, 326 F.3d at 380. However, given that the credibility determination was made without any reference specifically to migraines and the volume of medical evidence relating to the migraines left unmentioned in the ALJ's opinion, the Court will not affirm based solely upon the ALJ's generic credibility determination. See Thomas, 2015 WL 4067147, at *5 ("[a]n ALJ must be particularly diligent in making credibility determinations with regard to

expert testified that if Kulbacki's testimony about her migraines is assumed as true, she could not perform any type of work. (R. at p. 37).

The Commissioner puts forth a number of arguments regarding the medical evidence, none of which the Court finds persuasive.[5] The Commissioner points to a brain MRI taken in January 2010 and a number of physical examinations of Kulbacki's head which revealed no abnormalities. (ECF No. 18 at p. 9). Courts have consistently recognized the medical reality that brain scans and physical examinations cannot detect migraine headaches. See e.g., Thomas, 2015 WL 4067147, at *7; Salberg v. Astrue, 2012 WL 4478310, at *13 (W.D. Pa. Sept. 27, 2012); Abbruzzese, 2010 WL 5140615, at *7; Parsley, 2009 WL 1940365, at *4. Therefore, the MRI and physical examinations were not a sufficient basis for the ALJ to have discounted Kulbacki's complaints.

The Commissioner next argues the medical evidence shows that her symptoms are well controlled. (ECF No. 18 at pp. 9-13). As already noted, Kulbacki's two statements to treating sources that she responded positively to the Imitrex, do not go so far as to say her headaches were completely controlled, rather it appears from the record that her complaints persisted. See supra at pp. 3-5. The Commissioner points to other medical records that purportedly show her migraines were well controlled. (ECF No. 18 at p. 10). In one instance, emergency room records contain the line "MIGRAINE NOS NOT INTRCBL." (R. at p. 999). In another, a surgeon noted in a post-op report that Kulbacki's migraines were "presently asymptomatic." (R.

---

migraines"). The Court would also note as part of that credibility determination, the ALJ made much of Kulbacki's use of a cane:
> I cannot find a prescription for a cane in the medical evidence of record; and, in light of the generally normal findings concerning the low back and lower extremities, I am not persuaded that the claimant requires an assistive device for ambulation. The fact that she chooses to use a cane does not compel a finding that such use is medically required.

Contrary to the ALJ's assertion, a prescription for a cane does appear in the record. (R. at p. 545).

[5] Besides being unpersuasive, none of these arguments, or in most cases even the medical evidence they are based upon, appear in the ALJ's opinion.

at p. 1028). Besides not exactly being conclusive statements, the first appeared in medical records from an emergency room visit for abdominal pain, (R. at p. 999); the second in a post-op report following spinal surgery (R. at p. 1028). In both cases it is unlikely that Kulbacki or her doctors spent significant time and effort describing or evaluating her numerous other medical conditions. Similarly, the Commissioner points to other medical records that contain no mention of migraines. (ECF No. 18 at p. 12). While true, this does not seem especially significant given the breadth of treatment Kulbacki has received for her other medical problems. The fact that either Kulbacki did not always mention, or her physicians did not always take the time to note, migraines during visits to treat other ailments does not necessarily mean her complaints were insincere. As discussed, the record clearly demonstrates that Kulbacki sought treatment specifically for migraines on a number of occasions and even saw a neurologist for the condition over an extended period of time. Given that, it is unremarkable that her migraines were not noted in every single doctor visit for her extensive and unrelated health problems. Additionally, the record contains plenty of instances where physicians did note her history of migraines while treating Kulbacki's other conditions. See e.g., (R. at pp. 647, 722, 751, 867-69, 949, 953, 958, 1001, 1027, 1043, 1048, 1114).

Therefore the Court finds that the ALJ erred in failing to adequately consider the evidence of record relating to Kulbacki's migraines and in failing to explain why a severe impairment found at step two was subsequently disregarded at step four in formulating the RFC.

## V.     Conclusion

For the foregoing reasons, Kulbacki's motion for summary judgment (ECF No. 10) will be granted, the Commissioner's motion for summary judgment (ECF No. 17) will be denied, and

the ALJ's decision will be vacated and remanded for further consideration consistent with this opinion.

Dated: May 6, 2016

_____
LISA PUPO LENIHAN
U.S. Magistrate Judge

cc: All Counsel of Record